# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

─────────────────────────────────────────────────────────────────

**MARILYN JOHNSON, et al.,**

      Plaintiffs,

                                     **Case No.  00-2608 DP**

**v.**                                        **&**

**CITY OF MEMPHIS**,                      **Case No.  04-2017 DP**

      Defendant.


**FLORENCE BILLINGSLEY, et al.,**

      Plaintiffs,

                                      **Case No. 04-2013 DA**

**v.**

**CITY OF MEMPHIS,**

      Defendant.

─────────────────────────────────────────────────────────────────

## MEMORANDUM OPINION AND ORDER ON REMEDIES
─────────────────────────────────────────────────────────────────

Plaintiffs, officers of the Memphis Police Department ("the MPD"), brought this suit against their employer, the City of Memphis ("the City" or "Defendant"), for denying them promotion to the rank of sergeant during police promotional processes administered by the City. The suit consists of three consolidated cases challenging the promotional process conducted in 2000 ("the 2000 process") and the promotional processes conducted in 2001 and 2002 ("the 2002 process") under federal, state and local law. The three cases are <u>Johnson v. City of Memphis</u>, No. 00-2608 ("<u>Johnson I</u>"); <u>Johnson v. City of</u>

<u>Memphis</u>, No. 04-2017 ("<u>Johnson II</u>"); and <u>Billingsley v. City of Memphis</u>, No. 04-2013 ("<u>Billingsley</u>").

## I.  <u>FINDINGS OF FACT</u>

Since the early seventies[1] the employment practices of the City of Memphis have frequently been challenged in court as discriminatory against African Americans and women. The context of these challenges has often been the officer promotion processes within the Memphis Police Department. Although the City has invariably denied engaging in unlawful discrimination, it has admitted that certain of its past practices may have given rise to an inference of such conduct. In settlement of the various suits against it, the City has entered into a series of court-approved consent decrees establishing practices and procedures "to insure that blacks and women are not placed at a disadvantage by the hiring, promotion and transfer policies of the City and that disadvantage to blacks and women which may have resulted from past discrimination is remedied so that equal employment opportunities will be provided to all." (Pl.'s Trial Ex. 55, <u>United States v. City of Memphis</u>, C-74-286, Amended Consent Decree 2.)

In a 1979 consent decree entered into with the Afro American Police Association, the City admitted that "historically blacks have been excluded from or limited in hiring and promotional opportunities within its police department." (Pl.'s Trial Ex. 57, Stipulations of Facts 1, ¶ 1.) The City further admitted that its promotion examinations had not been

> prepared and the content of the oral interview was not developed
> on the basis of a professionally acceptable job analysis of the
> officer rank tested for. The City has conducted no study showing

---

[1] In 1974, the United States Department of Justice brought an action against the City of Memphis alleging that the City had engaged in race and gender discrimination in the hiring and promotion of its employees. <u>See</u> <u>Aiken v. City of Memphis</u>, 37 F.3d 1155, 1158 (6th Cir. 1994).

> those tests, the oral board evaluation or the promotional selection
> process as a whole, to be valid selection devices as required by
> Title VII of the Civil Rights Act of 1964, as amended, and the
> Guidelines issued thereunder.

Id. at 4, ¶ 10. The parties agreed that "the City is currently in the process of developing valid, job-related, and non-discriminatory selection procedures for the promotional ranks on the Memphis Police Department." Id. at 5, ¶ 15. While, by the City's estimate, the "development of fully validated processes [was] two to three years from accomplishment," the City represented that it was "developing interim promotion procedures to ensure with current limitations the selection of persons for promotion on the basis of fair, objective and job-related standards." Id. The City further stipulated that "to the extent that qualified black applicants are available . . . the percentage of promotions awarded to blacks at each rank shall constitute at least the percentage which blacks constitute in the next rank below." (Pl.'s Trial Ex. 57, Consent Decree 3, ¶ 4(b).)

In spite of the City's oft-repeated promises to institute properly validated promotion tests, the City continued to administer tests which were not validated as to job-relatedness and that resulted in adverse impact on African Americans. In a 1994 decision, the Sixth Circuit Court of Appeals noted that "incredibly, the City continues to make police and fire department promotions according to procedures that have not been validated." Aiken v. City of Memphis, 37 F.3d 1155, 1164 (6th Cir. 1994).

In 1996, the Sixth Circuit's admonishment and its concerns as to the constitutionality of the MPD's affirmative action program[2] provided the MPD with the

---

[2] On remand, the lower court found that the City's use of affirmative action in the 1988 and 1989 sergeant promotion was not narrowly tailored to achieve the City's compelling interest in eliminating discrimination. The court held that the City's use of affirmative action was unnecessary since the City could have developed validated testing procedures. See Ashton v. City of Memphis, 49 F.Supp. 2d 1051,1074 (W.D. Tenn. 1999).

necessary impetus to implement its first validated officer promotion. The process was developed by Dr. Mark Jones, an industrial and organizational psychologist, under the oversight of the Department of Justice's consultant, Dr. Irwin Goldstein. The promotion process was made up of four components: a written test, performance evaluations, seniority points, and a performance test/simulation that required candidates to demonstrate their abilities and skills of interviewing victims and suspects. The four sections received the following weights in calculating a final overall score: performance test, 50%; written test, 20%; performance evaluations, 20%; and seniority, 10%.

Unlike its many predecessors, the 1996 promotion process was not challenged as having an adverse impact on African American applicants. However, the police officers' union, the Memphis Police Association ("the MPA"), filed a grievance complaining that the 1996 process violated the 1984 Memorandum of Understanding ("the MOU") between the City and the MPA by establishing a new promotion procedure without proper consultation with the union. Among the more significant of the deviations from the MOU were the addition of a simulated investigation exercise to reduce the emphasis on the written test and the abandonment of a cut-off score on the written test as a preliminary hurdle. The reduced emphasis on the written knowledge test was based on findings that minorities tend to perform less well on such tests. The elimination of the cut-off score was based on the determination that the use of such a cutoff would further exacerbate the disparate impact on African Americans.

In arbitration, the MPA's grievances were rejected. The arbitrator found that the City had not violated the MOU, since the changes in the promotional procedures were

motivated by compelling legal and professional reasons, in accord with the terms of the MOU.

**The 2000 Process**

On March 20, 2000, the MPD issued an Information Bulletin scheduling the police sergeant promotion tests which would consist of two components, a written examination and a "practical application exercise." (Joint Ex. 1, Information Bulletin, March 20, 2000 at 2.) The only qualification for participation was five years of continuous service as a patrol officer.

The City again contracted with Dr. Jones to develop the officer promotion process, which was to be non-discriminatory and comply with the City's civil service laws. (McGee, Vol. 6 at 775-77.) The weighting of the process was to be modeled after that of the 1996 process, with the four components receiving the following weights: job knowledge test, 20%; video-based practical test, 50%; performance evaluations, 20%; and seniority, 10%.

Unlike the 1996 process, the 2000 process utilized a cutoff score on the written test as an initial hurdle in the promotion process, i.e., candidates had to score above the cutoff in order to proceed to the practical test. Their written test score was then combined with the other three test elements, after weighting and standardizing, to arrive at a total score.[3] This structure was set forth in a Study Guide that was provided to all candidates.

In May 2000, the written examination was administered to 444 candidates, consisting of 228 African Americans, 212 whites, and 4 "other" candidates. As required under the MOU, a cutoff score of 70 was initially applied to the written test. Utilizing this

---

[3] Dr. Jones had objected to this use of a cutoff score as invalid and indefensible, and his rejection of its use in the 1996 process was upheld in arbitration, as noted supra. Nevertheless, in developing the 2000 process he apparently succumbed to continued pressure from the MPA to adhere to the letter of the MOU.

cutoff score, however, resulted in an adverse impact ratio of .77, which was less than the .80 minimum acceptable ratio under the four-fifths rule[4] as described in the Uniform Guidelines. Dr. Jones recommended that the City lower the cutoff score to 66, which he arrived at by subtracting one standard measure of error from a score of 70. Using the 66 cutoff score, 389 of the 444 candidates (or 88%) (consisting of 190 African Americans, 195 whites, and 4 "other") were allowed to proceed to the video test, thus satisfying the EEOC's four-fifths rule at that initial stage.[5]

On or about June 1, 2000, the City discovered that portions of the practical exercise component of the test had been leaked to certain applicants prior to their taking the test, thereby compromising the results.  The City responded to the compromise of the promotion process by excluding the practical component from consideration in scoring and increasing the weight given to the written test and the performance evaluations from 20% to 45%.

Two patrol officers who unsuccessfully competed for promotion to sergeant in the MPD's 2000 promotion process filed an employment discrimination action ("Johnson I") on July 11, 2000, alleging that the elimination of the practical exercise test from consideration in promotion decisions had a disparate impact on racial minorities in the MPD and amounted to intentional unlawful discrimination by the City. The complaint was brought under 42 U.S.C. § 1983; the Fourteenth Amendment; Article I, Section 8 of

---

[4] Under the four-fifths rule the success rates of minority candidates and non-minority candidates is compared. The number of candidates in each group passing the test is divided by the total number of candidates in that group. The passage rate for minorities is then divided by the passage rate for non-minorities. A ratio of 4 to 5, or 80%, is considered the minimum necessary to avoid a determination of adverse impact on minorities under the rule.

[5] Applying the four-fifths rule to the relevant numbers, 190 African Americans passed the written test out of 228 African American candidates, a passage rate of 83%. 195 whites passed out of 212 candidates, a passage rate of 92%. Dividing 83% by 92% yields a comparison ratio of 90%, exceeding the 80% "four-fifths" threshold and thus satisfying the four-fifths test.

the Tennessee Constitution; and the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-101, et seq. ("THRA"). Plaintiffs sought to enjoin the City from filling the vacant sergeant positions and to restrain the City from making promotions to sergeant until the Court conducted a hearing on the application for a preliminary injunction. The Court denied the original plaintiffs' request for a temporary restraining order and preliminary injunction.  The Court held that the plaintiffs had demonstrated neither a likelihood of success on the merits nor irreparable injury, and that the harm to Defendant and the public from a shortage of sergeants would be great.

Dr. Jones provided the City with a rank ordered promotion list based on the results of the 2000 process. On July 12, 2000, the City promoted the first 63 candidates on the promotion list in rank-order, 28 of whom were African American and 35 of whom were white.

On September 12, 2000, the complaint was amended, adding fifty additional plaintiffs. Of the fifty-two plaintiffs, twenty-three identified themselves as African American, two as Hispanic, and twenty-seven as white.  As revised, the complaint alleged that the MPD had intentionally discriminated against African American and Hispanic plaintiffs by eliminating the practical exercise test from the 2000 promotional process and by increasing the weight of the written test after the process had been completed. Plaintiffs further alleged that the MPD had intentionally discriminated against Caucasian plaintiffs by releasing in advance unauthorized study materials for the practical exercise test to a selected group of African American candidates. The complaint claimed violations of 42 U.S.C. § 1981, 42 U.S.C. § 1983, the Fourteenth Amendment,

Tennessee Code Annotated § 4-21-401, and Memphis city laws requiring the use of competitive job-related tests.

Under this First Amended Complaint, Plaintiffs sought declaratory judgment holding the 2000 promotion process to be invalid. Plaintiffs also requested that the MPD be enjoined from making any further promotions to the rank of sergeant based on the 2000 promotion process; that those sergeants who had already been promoted pursuant to the 2000 process be required to compete in a new promotional process to be developed and administered under the oversight of a court-appointed receiver; and that any sergeant shown to have received, used, or benefited from unauthorized study materials be disqualified from competing in the new promotional process. In the alternative, Plaintiffs requested that they be awarded backpay with interest, and retroactive promotion to sergeant. On October 25, 2001, Plaintiffs amended the complaint to add a claim that Defendant had violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 et seq.[6]

The City ultimately conceded that the 2000 process was invalid. As a result, on June 25, 2001, this Court entered partial summary judgment in favor of the Johnson I plaintiffs, declaring the 2000 process to be invalid on grounds that it violated § 250.1 of the City Charter and City Ordinance § 9-3. The Court reserved ruling on the issue of what relief, if any, was proper.   The City's expert had informed the Court that the compromised 2000 test could not be salvaged and that a new test would have to be

---

[6] On January 11, 2001, Johnson I plaintiffs, with the exception of plaintiff Constance Young, filed with the Equal Employment Opportunity Commission ("EEOC") charges of race discrimination by the City in connection with promotions to sergeant.  Thirteen of the plaintiffs also filed with the EEOC charges of gender discrimination by Defendant.  These plaintiffs received a right to sue authorization from the EEOC on July 27, 2001.

developed and administered to cure the effect of the cheating and of the elimination of the practical test for consideration in promotion decisions.

On July 2, 2001, the Court granted the City leave to begin a new promotional process in September 2001. Defendant notified sergeants who had been promoted to sergeant in the 2000 process that their promotions were rescinded and that they would be required to compete in the upcoming promotion process. Pending the results of the new promotion process, the sergeants were given the option of returning to their pre-promotion positions or remaining in their current positions with a 5% out-of-rank reduction in pay.

On September 7, 2001, the Tennessee Chancery Court enjoined the City from demoting and/or reducing the pay officers who had been promoted to sergeant based on the invalid 2000 test until promotions were made from the 2002 sergeants' promotion process. Green v. City of Memphis, No. CH-01-156601 (Ch. Ct. Tenn. August 21, 2001). The court acknowledged this Court's order holding the 2000 test invalid, but found that the order did not require the promotions to be rescinded.  Defendant complied with the chancery court's order and no sergeants were demoted.

**The 2002 Process**

The City contracted with Jeanneret & Associates ("J&A") to design a new officer promotion process. J&A's mandate from the City was to create a test that would be "nondiscriminatory,  . . . legally defensible, meet the Federal Uniform Guidelines, and be consistent with the charter." (Claxton, Tr. Vol. 17, 2006.)

The 2002 process that resulted was more sophisticated than the 2000 process in many ways. Test security was tightened to prevent the kind of compromise that occurred

in 2000. All candidates were informed in advance of the format of the test and the weighting of the various components, and this structure was reflected in the actual process administered. A study guide was provided to all candidates to "level the playing field."

A formal test plan was submitted to the Court for purposes of full disclosure to all interested parties. The test plan primarily consisted of a comprehensive, step-by-step description of the job analysis work that was conducted, a description of the literature review, and consideration of various testing alternatives conducted. At that time, Dr. Jeanneret advised the Court that he was going to follow a content validity approach. There was discussion with the Court about using a criterion-related validity approach, but Dr. Jeanneret did not think it was feasible under the circumstances to use this method due to the security issues involved.

The final process design addressed concerns raised by Plaintiffs' expert, Dr. Sharf, particularly with regard to the possibility that individuals that had been promoted to sergeant in 2000 might have an unfair advantage over those candidates that had not performed the job of sergeant. These issues were resolved to the satisfaction of Dr. Sharf. The process was multi-faceted, assessing a broad range of job skills. Components included an investigative logic test, a job knowledge test, an application of knowledge test, a grammar and clarity test, and an oral response test.

The City administered the new process September 27-29, 2001, and scoring of the tests was completed in the fall of 2002. The process resulted in substantial adverse impact on minority applicants. In a hearing held December 16, 2002, Dr. Jeanneret said "I have

looked at everything that I can possibly look at about this test. I cannot find the reason why." (Pf.'s Ex. 52 at 75.)

In December 2002, Dr. Jeanneret provided the City with a rank-ordered list and recommended that the list be used to make promotions. Dr. Jeanneret advised the City that, based upon his test development and the analysis that he had performed, the test was content valid and could be used for ranking purposes in the selection of individuals to the rank of sergeant. (Jeanneret, Vol. 11, 1263, 1266; Vol. 14, 1643, 1655.)

Out of 274 African American candidates and 240 white candidates, 86 African Americans were selected for promotion, compared to 176 whites. On January 10, 2003, the City took the unusual step of promoting all 264 patrol officers selected at one time instead of its usual practice of promoting on the basis of need over a two-year period. (Tusant, Tr. Vo. 6, 731-32).

On April 23, 2003, the Chancery Court dissolved the preliminary injunction in Green. This allowed the City to remove from the rank of sergeant those officers who had been promoted to sergeant as a result of the invalid 2000 test but who failed in the 2002 test to rank at the level required for promotion to sergeant.

On September 19, 2003, the City issued an Information Bulletin announcing the 2003 process for promotion from sergeant to lieutenant. Among other eligibility requirements, candidates for the lieutenant positions were required to have served at least two continuous years in the sergeant's grade by October 20, 2003. Eligible candidates could take the qualifying exam scheduled for December 4-6, 2003.

On October 21, 2003, two of the Johnson I plaintiffs who had been promoted to sergeant as a result of the 2002 process requested a preliminary injunction against the

MPD.  After applying to take the lieutenant promotion exam, the plaintiffs had received letters informing them that they were ineligible to take the exam because they did not have two years of service as a sergeant.  Plaintiffs  requested that the Court issue injunctive relief regarding all plaintiffs in this case mandating that the City either (1) allow all plaintiffs to take the lieutenant's promotion test on December 4-6, 2003; (2) set aside fifty-two vacant lieutenant positions until this case is concluded; or (3) refrain from conducting the lieutenants' promotion process until this case is concluded.  The Court granted Plaintiffs' motion in part by ordering the City to hold open fifty-two vacant lieutenant positions until this case is concluded.

In the face of opposition from the City to their motion to amend the complaint to include the 2002 process, on January 9, 2004 the fifteen African American Johnson I plaintiffs who were not promoted to sergeant challenged the 2002 process in a separate suit on grounds similar to those asserted in Johnson I.  Contemporaneously with this "Johnson II" filing, a separate group of 35 African American plaintiffs filed suit (the "Billingsley" case) asserting the same claims alleged in Johnson II.  On February 27, 2004, the Johnson I complaint was amended for the third time to include an allegation of intentional discrimination against the African American plaintiffs for failing to promote them to sergeant in the 2002 process in violation of 42 U.S.C. § 1981 and Title VII.  Plaintiffs also added a claim that the City was negligent in the development and implementation of the 2002 promotion process.

On October 28, 2004, the Court entered partial summary judgment on the Title VII disparate impact claims of the Johnson II and Billingsley plaintiffs regarding the 2002 process, finding that the plaintiffs had established a prima facie case of disparate

impact, thus shifting to the defendant the burden of showing that the process was job-related. On February 4, 2005, the Court entered summary judgment in favor of Johnson I plaintiffs on their Title VII disparate impact claim as to the 2000 promotion process on grounds that the City had not offered any proof that the written test was job-related or a business necessity.

On November 17, 2004, recognizing that the three cases shared common questions of law and fact, the Court granted the City's motion to consolidate the Johnson I, Johnson II and Billingsley cases in the interest of efficiency and judicial economy.

On July 6, 2005, the court entered partial summary judgment in favor of the City with respect to all plaintiffs' Equal Protection claims based on a "class of one" theory, as well as all plaintiffs' claims of negligence with respect to both the 2000 and 2002 processes.

Following a bench trial of the consolidated cases on July 11 - 27, 2005, the Court entered a directed verdict dismissing the non-minority Johnson I plaintiffs' claims of intentional race discrimination, on August 18, 2005.

In summary, the following claims and issues have already been decided by the Court: 1) The 2000 process violated city laws and is thus invalid; 2) Judgment was granted in favor of African American plaintiffs on Title VII disparate impact claim as to the 2000 process; and 3) Johnson II and Billingsley plaintiffs have established a prima facie case of disparate impact as to the 2002 process.

The following claims and issues remain: 1) claims of intentional race discrimination under the THRA, Title VII, § 1981, and the Equal Protection Clause (through § 1983) by the African American Johnson I plaintiffs with respect to the 2000

process; 2) claims of intentional race discrimination under the THRA, Title VII, § 1981, and the Equal Protection Clause (through § 1983) by the Johnson II and Billingsley plaintiffs with respect to the 2002 process; 3) a claim of disparate impact under Title VII by the Johnson II and Billingsley plaintiffs with respect to the 2002 process; 4) a claim of violation of the City Charter and City Ordinance by the Johnson II and Billingsley plaintiffs with respect to the 2002 process; and 5) the relief available, if any, to the plaintiffs.

## II.  CONCLUSIONS OF LAW

### a.  Civil Service Laws

The Court has previously found, based on the City's concession, that the 2000 promotion process was invalid and violated applicable city laws. See Johnson v. City of Memphis, 73 Fed. Appx. 123, 128 (6th Cir. 2003). The Court left undecided what relief, if any, was proper.

Johnson II and Billingsley plaintiffs allege that the 2002 process also violated Memphis city law, specifically § 250.1 of the Memphis City Charter and § 9-3 of the Memphis Code of Ordinances. Section 250.1 of the City Charter provides, in pertinent part, as follows:

> All applicants for employment in positions protected by this article shall be subjected to competitive job-related examinations under such rules and regulations as may be adopted by the Director of Personnel. The examinations to be provided for shall be of a *practical nature* and relate to such matters as will fairly test the relative competency of the applicant to discharge the duties of the particular position. These examinations should be developed in conjunction with other tools of personnel assessment and complemented by sound programs of job design to aid significantly in the development and maintenance of an efficient work force and in the utilization and conservation of human resources.

(emphasis added).

Section 9-3[7] of the City Ordinances essentially mirrors the § 250.1 of the City Charter, providing that

> (a) All applicants for employment in positions protected by this article shall be subjected to competitive job-related examination under such rules and regulations as may be adopted by the director of personnel.
>
> (b) The examination to be provided for shall be of a *practical nature* and relate to such matters as will fairly test the relative competency of the applicant to discharge the duties of the particular position.

Memphis Code of Ordinances § 9-3 (1985) (emphasis added).

The Court's finding that the 2000 process violated city law centered on the City's elimination of the practical component of the process. A strong argument can be made that a process relying entirely on a written knowledge exam, performance evaluations, and seniority, all of which are known to adversely impact minorities, does not satisfy the requirements of the Charter and Ordinance for practicality and fairness.

The 2002 process avoided the key shortcomings of the 2000 process. The written knowledge component was only one of five testing modalities utilized. The other components measured various practical job skills. Each of the five components received equal weight. No cutoff score was used. Numerous measures were adopted to reduce any potential adverse impact on minority candidates, such as an impartial review of the test items for fairness and cultural bias and greater emphasis on measuring communication and interpersonal skills and lesser emphasis on measuring cognitive skills.

The relevant city laws are broadly worded. They essentially require that promotion processes be fair, practically-oriented, and job-related. The Court finds that the

---

[7] This provision is § 3-8-4 in the present Code of Ordinances.

2002 process satisfied these requirements. The process' adverse impact on minority candidates and the City's decision to proceed with promotions anyway raise other legal issues, discussed in the following section, but do not constitute violations of the City Charter and Ordinances as to the 2002 process.

Accordingly, the Court finds for the Defendant on Plaintiffs' claims of violation of City law.

### b.  Title VII Claims: Disparate Impact and Disparate Treatment

The Supreme Court has recognized two types of Title VII employment discrimination: disparate impact and disparate treatment. See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335-36 n. 15 (1977). Disparate impact involves employment practices that are facially neutral in their treatment of different groups but which have a disproportionately negative effect on certain protected groups, and which cannot be justified on business necessity grounds. Id. Disparate treatment occurs when an employer treats some people less favorably than others based upon their race, gender, religion, etc. Id. To prevail in an action for disparate treatment, the plaintiff must show discriminatory motive, either by direct evidence or by inference based on a prima facie showing of discrimination. Id.; Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981); McDonnell Douglass Corp. v. Green, 411 U.S. 792, 802 (1973).

### i.  Disparate Impact

Title VII prohibits the use of employment practices that are "fair in form but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971). The Supreme Court in Griggs and Albemarle Paper Co. v. Moody, 422 U.S. 405 (1974) set forth a three-step burden-of-proof standard for determining whether the use of a

particular employment practice has a disparate impact upon minorities. In a promotions context, the plaintiff must first establish a prima facie case by showing that a promotions process has a measurably discriminatory impact, regardless of motive or intent or appearance of evenhandedness. See Wards Cove Packing co. v. Antonio, 490 U.S. 642, 649 (1989); Watson v. Fort Worth Bank and Trust Co., 487 U.S. 977, 986 (1988).

Once the plaintiff has established a prima facie case, the employer must meet the "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." Griggs, 401 U.S. at 432. If the discriminatory employment practice "cannot be shown to be related to job performance, the practice is prohibited." Id. at 431. If the employer meets its burden of showing a practice bears a demonstrable relationship to the successful performance of the jobs for which it is used, it is then up to the plaintiff "to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship." Albemarle, 422 U.S. at 432.

In its February 4, 2005 order granting Plaintiffs partial summary judgment, this Court found that Plaintiffs had established a prima facie case of disparate impact under Title VII with regard to the 2002 process. Having made out a *prima facie* case, the burden of production shifts to Defendant to show that the test was job-related or a business necessity.

The 2002 process was based on a comprehensive job analysis that focused on the knowledge, skills, abilities and personal characteristics ("KSAPs") needed for successful performance as a sergeant. Plaintiffs do not challenge any of the specific test items as being entirely unrelated to the job of an MPD sergeant; rather, they argue that a

relationship to necessary job skills alone is insufficient to satisfy the <u>Griggs</u> test. Specifically, Plaintiffs argue that the process as a whole lacks two necessary qualities: validity and reliability. As Plaintiffs' expert testified, "Without assessing the quality of the tests, you don't know what your test scores mean." (DeShon, Tr. Vol. 3 at 386-87.) Plaintiffs further argue that the approach used to validate the process was inappropriate for the purposes of ranking candidates for promotion.

### ii.  Validity

To establish whether an employment test is job-related for a particular purpose, the EEOC has issued its Uniform Guidelines on Employee Selection Process ("the Guidelines"). <u>See</u> 29 C.F.R. § 1607.

> The message of these Guidelines is the same as that of the <u>Griggs</u> case – that discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated."

<u>Albemarle</u>, 422 U.S. at 430-31 (internal quotations omitted).

Validation is the process of demonstrating that the promotional procedure is sufficiently job-related. (Deshon, Tr. Vol. 15 at 1717). The concept of validation presumes that the level of performance on the selection procedure will, "on the average," be indicative of level of performance on the job. (Pl. Ex. 70, Q. 54.) The Guidelines describe three methods that may be used to validate an examination: (1) content validation, (2) construct validation, and (3) criterion-related validation. 29 C.F.R. § 1607.5(B) (2006). The City chose to base the 2002 promotion upon the content-validity model in which the validity of the process is based on a judgment of the extent to which the test is representative of the job content.

The Guidelines state that content validity is demonstrated by showing that the test content is a "representative sample" of the important aspects of performance on the target job. 29 C.F.R. §§ 1607.5, 1607.14(C)(1) (2006). The content validity model does not require the test developer to assess every critical KSAP identified in the job analysis. See Zamlen v. City of Cleveland, 906 F.2d 209, 218 (6th Cir. 1990). Additionally, there is no requirement that the process measure the KSAPs in direct proportion to their importance to the job. The Sixth Circuit has stated that the "degree of proportionality is largely a matter within the professional judgment of the test writer based upon the particular attributes of the job in question," and that, in some instances, exact proportionality may be impossible to achieve and "is not the standard by job relatedness should be measured." Police Officers for Equal Rights v. City of Columbus, Ohio, 916 F.2d 1092, 1099 (6th Cir. 1990).

Jeanneret & Associates sought to assess all 44 of the important KSAPs identified in the job analysis and designed the test questions to meet the content validity requirements for the assessment. The investigative forms and other materials used in the investigative logic test and oral component were very similar to the actual materials used on the job and clearly simulated critical job duties. Additionally, all of the items on the job knowledge test were developed using the same reference materials used by MPD sergeants on the job. The investigative logic test involved realistic scenarios that were designed to simulate situations encountered and investigative activities performed by sergeants on the job. Likewise, the application of knowledge test was designed to evaluate how a candidate would respond to common situations encountered on the job. The oral component also involved realistic scenarios designed to simulate situations in

which a sergeant would be expected to use oral communication skills in responding to a superior officer, responding to the mother of a victim, and responding to a new partner.

Plaintiffs attack the validity of the 2002 process claiming that because seniority was an unvalidated measure, its combination with the test scores to arrive at a promotion score invalidated the entire process. The Court finds this argument unavailing in light of the Supreme Court holding that a "bona fide seniority system does not violate Title VII even if it perpetuates past discrimination." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 352-53 (1977). Under this precedent, a seniority system is valid as long as there is no intent to discriminate and it has been maintained free from any illegal purpose. Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 481 (6th Cir. 1987).

In the present case, the City had a bona fide seniority system, and the MOU required the addition of seniority points based on the officers' length of service to the overall test scores. It would have been improper for Dr. Jeanneret to consider the assessments and content validity of the 2002 process in combination with seniority measures since under City of Akron the validity of seniority is based on completely different, non-statistical considerations.

Accordingly, the Court concludes that the test content constituted a representative sample of the important aspects of performance for the job of sergeant and that the 2002 process was therefore content valid.

### iii.  Reliability

Plaintiffs further assert that the job-relatedness of the 2002 process was insufficiently established because it was not properly evaluated for reliability. Reliability

is used to determine measurement error, i.e., the precision of the test to measure the quantities it is intended to measure. (DeShon, Tr. Vol. 14 at 1684.)

Dr. Jeanneret testified that he did not include a reliability estimate in the validation report because the 2002 process was heterogeneous, i.e., it measured numerous broad KSAP dimensions that were correlated with one another, and he felt that there was no appropriate estimate of reliability.  According to Dr. Jeanneret, the most appropriate approach to reliability for such a heterogeneous test was test-retest reliability, which was not feasible under the circumstances. A reasonable alternative, Dr. Jeanneret asserted, would have been to develop an alternate form, requiring two identical tests which, he believed, was not possible in light of the particular testing environment. Since neither multiple administrations of the test nor parallel administration of identical tests were practicable, Dr. Jeanneret believed the only potentially applicable method of assessing reliability was to measure internal consistency using "coefficient alpha." Dr. Jeanneret did not initially compute coefficient alpha because he intentionally designed a very heterogeneous test and making coefficient alpha, in his opinion, an inappropriate index of reliability. (*Jeanneret*, Vol. 11, pp. 1273- 77, 1279 1281-84, Vol. 14, p. 1626).

Both Dr. Jeanneret and Dr. DeShon subsequently measured coefficient alpha, using somewhat different methodologies. Dr. DeShon reported an overall reliability coefficient of .76 using a method known as stratified alpha. Dr. DeShon included seniority in his analysis, which Dr. Jeanneret testified was inappropriate because seniority was not part of the measurement process. (Jeanneret, Tr. Vol. 11, 1287-88; DeShon, Tr. Vol. 5, 575; Tr. Vol. 16, 1898, 1912.)  The Court agrees that inclusion of seniority was inappropriate in assessing the reliability of the test. Since seniority was an administrative

add-on component, there is no reason to expect that there would be a significant correlation or internal consistency between seniority and test items. Dr. Jeanneret eventually performed a reliability analysis using a "linear composite," which resulted in a coefficient of .82. He also computed reliability using the formula for stratified alpha, which resulted in a coefficient of .83.

The Court finds credible Dr. Jeanneret's testimony as to the limited applicability of coefficient alpha in measuring reliability of a heterogeneous test which draws material for test items from multiple sources. The Court further finds that Dr. Jeanneret's computations of stratified alpha without inclusion of seniority scores to be more appropriate than Dr. DeShon's computation, which included seniority. Finally, the Court finds that Dr. Jeanneret's conclusion that the 2002 process was sufficiently reliable is consistent with professional standards and is supported by relevant law. See Hearn v. City of Jackson, 340 F. Supp. 2d 728, 740-41 (S.D. Miss. 2003) (finding that a reliability coefficient of .79 is a common and acceptable value in the context of a heterogeneous test environment).

Based on the foregoing analysis, the Court finds that the 2002 process was sufficiently reliable under the circumstances.

### iv.  Rank Ordering

Plaintiffs argue that the use of content validity for the purposes of ranking officers is inadequate and inappropriate, and thus the 2002 process should be deemed invalid even if the individual components of the process were valid. Under both Sixth Circuit precedent and the Guidelines, ranking of candidates is appropriate where it can be shown that a higher score correlates with higher job performance. See Williams v. Vukovich,

720 F.2d 909, 924 (6th Cir. 1983); 29 C.F.R. § 1607.14(C)(9) (2006). The requirements for rank ordering can be met through a substantial demonstration of job-relatedness, variance in test scores, and an adequate degree of test reliability. Guardians Ass'n of New York City Police Dept., Inc. v. Civil Service, 630 F.2d 79, 104 (2d Cir. 1980).

As discussed above, the test content of the 2002 process was substantially job-related and there was an acceptable level of test reliability. Many sections of the test consisted of items in which there were several right answers, with differing point values for various elements, and/or opportunities for additional credit, all of which serve to distinguish better performing candidates from lesser performing candidates. (Def's Ex. 22, pp-43-46.) The written test was closely modeled after the like section in the 2000 process, which Dr. DeShon acknowledged was able to differentiate between those candidates with more job knowledge from those with less knowledge. (DeShon, Tr. Vol. 5, 546-47.) Additionally, the raw scores on the 2002assessment show a substantial variance, with the highest raw score of 358.750 and the lowest of 174.750, among 517 candidates. (Def's Ex. 17). See City of Columbus, 916 F.2d at 1102-03 (upholding rank ordering where score range was 40 points among 71 candidates).

Based on the foregoing, the Court finds that rank ordering of the results of the 2002 process was proper, given that the test had an acceptable level of test reliability, was substantially job-related, and had substantial variance among the scores.

Having found the 2002 process to have been sufficiently valid and reliable, the Court concludes that Defendant has satisfied its burden under Title VII of showing that the 2002 process was job-related as required under Title VII. With this initial showing of job-relatedness, the burden now shifts to Plaintiffs to show that other testing modalities

were available which would have served the City's interests in merit-based promotions without a similarly undesirable racial effect.

### v. Alternative Testing Modalities

Section 1607.3 of the Guidelines provides that

> Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact.

Plaintiffs claim there were several equally valid alternative selection procedures that would have resulted in less adverse impact than the actual 2002 process. The first was to use a practical exercise of the type used in the 1996 process. That practical exercise, Plaintiffs assert, had substantial content validity and had less adverse impact than any test used in the 2002 process. (DeShon, Tr. Vol. 15, 1769; DeShon, Tr. Vol. 16, 1865-66). Plaintiffs further maintain that the 1996 "high fidelity" simulation of actual on-the-job behaviors "was more consistent with the standards of content validity" than the low fidelity simulation that resulted in greater mean score differences between whites and blacks. (Pl's Ex. 18, DeShon Memo May 20, 2005.) Plaintiffs argue that such a "practical" type test would have fully met the City's obligation to conduct competitive, job-related, non-discriminatory tests of a "practical nature" that measure the relative competency of the candidate to discharge the duties of a sergeant. (Pf's. Ex. 48, Jones Dep. at 5, 7.) Plaintiffs further assert that the 1996 practical test was substantially less expensive than the 2002 tests. Defendant counters that the 1996

case simulation was the weakest component of the process, was exorbitantly expensive and labor intensive and created serious security concerns.

Second, Plaintiffs suggest that assessments of integrity and conscientiousness are substantially equally valid with less adverse impact than any of the tests used in the 2002 process. Defendant counters that integrity and conscientiousness were not assessed because these qualities were not identified by the MPD's subject matter experts (SMEs) as important to the sergeant job during the job analysis. Plaintiffs respond that in the context of a promotion process development project in another city, Dr. Jeanneret had portrayed the assessment of those particular qualities as having high validity and low adverse impact. Plaintiffs argue the Dr. Jeanneret should have relied on this knowledge to include those assessments, regardless of the failure of the SMEs to identify them.

Finally, Plaintiffs assert that a merit promotion process used in Chicago, in which Dr. Jeanneret was involved, represented an equally valid selection process with little adverse impact. (DeShon, Tr. Vol. 15, 1744; Pf.'s Ex. 65, Chicago Validation Report vol. 2 at 83.) Plaintiffs maintain that evidence regarding the Chicago process, which differed markedly from the 2002 process, demonstrates the lack of credibility of Dr. Jeanneret's statement that he knew of no other process that would have less adverse impact and that he provided the City with "all the options I could think of." (Pl.'s Ex. 52, Jeanneret, Transcript of Hearing, December 16, 2002 at 143.) Defendant maintains that Dr. Jeanneret considered the use of a merit-based process or panel interviews and rejected such approaches based on the amount of subjectivity involved and the potential for bias.

The Court finds merit in all three of Plaintiffs' broad suggestions as to alternative testing modalities. It is of considerable significance that the City had achieved a

successful promotional program in 1996 and yet failed to build upon that success. While the 1996 process was not perfect it appears to have satisfied all of the legal requirements of promotional processes. The 2000 process departed substantially from the 1996 model in its abandonment of the practical exercise and re-weighting of the remaining elements. The 2002 processes, while arguably more sophisticated than its predecessors, suffered from a grossly disproportionate impact on minority candidates.

It is unnecessary for the Court to scrutinize the advisability of incorporating assessments of qualities such as integrity and conscientiousness or the relative merits of the Chicago process. It is sufficient to acknowledge that the existence of such alternative measures and methods belies, as Plaintiffs suggest, Defendants' position that they had no choice but to go forward with the 2002 promotion process despite its adverse impact because no alternative methods with less adverse impact were available.

Defendant argues that Plaintiffs have failed to meet their burden because none of the alternatives now suggested were proposed at the time the 2002 process was implemented. This argument misconstrues the appropriate standard. Plaintiffs must prove that there was "another *available* method of evaluation which was equally valid and less discriminatory." Bryant v. City of Chicago, 200 F.3d 1092, 1094 (7th Cir. 2000). (emphasis added). Plaintiffs are not required to have proposed the alternative. The requirement is only that the alternative was available. The Court reads "availability" in this context to mean that Defendant either knew or should have known that such an alternative existed. Plaintiffs have amply demonstrated that Defendant knew of all three alternatives they have set forth.

For the foregoing reasons, the Court finds that Plaintiffs have met their burden of showing "that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship." Albemarle, 422 U.S. at 432. Accordingly, the Court finds for minority Plaintiffs on their Title VII disparate impact claim as to the 2002 process.

### 1.  Disparate Treatment

Plaintiffs allege that the City intentionally discriminated against them in violation of the THRA, § 1981, § 1983, and Title VII. Claims under the THRA are analyzed under the Title VII evidentiary framework. Dobbs-Weinstein v. Vanderbilt Univ., 1 F.Supp. 2d 783, 790-91 (M.D. Tenn. 1998), aff'd, 185 F.3d 542 (6th Cir. 1999). The same Title VII framework governs a disparate treatment claim under § 1981 and § 1983 in the context of race discrimination in public employment. See Sutherland v. Mich. Dept. of Treasury, 344 F.3d 603, 614 (6th Cir. 2003); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 573 n. 5 (6th Cir. 2000). Thus, Plaintiffs' allegations of intentional discrimination under the four statutes require only a single analysis.

To prevail in an action for disparate treatment, the plaintiff must show discriminatory motive, either by direct evidence[8] or by inference based on a prima facie showing of discrimination. Although disparate treatment is treated by the courts as a theory distinct from disparate impact, the two theories utilize closely similar analytical frameworks borne of a common lineage. The three-part burden-of-proof standard applied supra was developed by the Supreme Court in McDonnell Douglas in the context of disparate treatment suit. Just as was described in the context of disparate impact, the

---

[8] Plaintiffs present their evidence of discrimination in the context of the McDonnell Douglas framework to argue that the Defendant's stated reasons are mere pretext. Consequently, the Court will not address whether Plaintiffs have presented evidence which shows discrimination directly.

plaintiff claiming disparate treatment, in the absence of direct evidence, must first establish a prima facie case of discrimination. Once the plaintiff has made a preliminary showing of adverse impact, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employees' rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802(1973).  It is only the third part of the McDonnell Douglas structure which is distinctly different in the disparate treatment context: The plaintiff must convince the trier of fact that the defendant's stated reasons for its actions are mere pretext, masking actual discriminatory intent.

The Court has addressed the first two steps of the disparate treatment analysis in the previous section: Plaintiffs have established a prima facie case of discrimination and Defendant has met it burden of production and thus has rebutted any legal presumption of intentional discrimination. Where the defendant has "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action," then it is up to the plaintiff to persuade the trier of fact that the employer's stated reasons are mere pretext and that the defendant intentionally discriminated against the plaintiff. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

Plaintiffs argue that the City's intent to discriminate is evidenced by the City's promotion in 2000 of white candidates over their black counterparts on the basis of an invalid process, in spite of its adverse impact. Plaintiffs further argue that the City's success in defeating a union grievance regarding the 1996 process by convincing an arbitrator that a practical test was required to produce a valid job-related promotion

process clearly indicates that the City knew that by pulling the practical test from the 2000 process an invalid process would result. Given the City's knowledge, based on decades of experience, that its written test invariably causes a disparate impact on African Americans, Plaintiffs argue, the City's adoption of the written test as a primary determinant of success in the promotion process is direct evidence of discriminatory intent.

As to the 2002 process, Plaintiffs assert that evidence of discriminatory intent is found in the disparity between African American and white candidates in test performance without any credible explanation by the City; the City's failure to report score reliability and other statistical indices; and the City's promotion of all 264 candidates at the same time, in an alleged effort to limit the possibility of court intervention.

In essence, Plaintiffs argue that the City's use of an objective rank-ordering promotion system based upon a scientific model is mere pretext, in light of the City's knowledge of the invalidity of the 2000 process and the disparate impact of the 2002 process.  The Court finds Plaintiffs' pretext arguments unavailing in view of the context in which the City's decisions were made. Specifically, in both the 2000 and 2002 process, the City expended considerable resources on a promotion scheme that would be both effective and nondiscriminatory. The process designers, Drs. Jones and Jeanneret, were given clear mandates by the City to come up with processes that would be fair and nondiscriminatory.

In 2000, the process was compromised by wrongdoing on the part of unknown individuals. As a result, the City made a judgment call to scrap the compromised portion

of the test, adjust the weights of the remaining portions and proceed with the process. The prudence of this decision is highly questionable, as Plaintiffs assert, given the City's history and knowledge of the adverse impact of written tests on minorities. However, in determining whether an employer's stated reason is pretextual or not, the Court does not examine the fairness or wisdom of the employer's business judgment. It would be inappropriate for the judiciary to substitute its judgment for that of the employer. Smith v. Leggett Wire Co., 220 F.3d 752, 763 (6th Cir. 2000). To conclude that the City's purported intention of creating a racially neutral promotion process was mere pretext would require the Court to infer that the compromise of the process was part of a deliberate scheme by the City to deny promotion to minority applicants by giving the City cover for scrapping the racially-balanced design of its promotion program. The evidence offers no support for such an inference, and Plaintiffs make no such suggestion.

Even if the process had not been compromised, the 2000 process would have been vulnerable to legal challenge for its use of a cutoff score on the written test. Equal Employment Opportunity Commission ("EEOC) Guidelines provide that "where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force." 29 C.F.R. § 1607.6(h) (2006). In a case related to the one at bar, this Court has interpreted this provision to mean that "[in] order to be valid . . . the cutoff score . . . must appropriately measure the *minimum qualifications* necessary for successful performance of the job of lieutenant in the Memphis Police Department." Isabel v. City of Memphis, 2003 WL 23849732, at *7 (W.D. Tenn. Feb. 21, 2003). In other words, a cutoff score may only be used to eliminate candidates for consideration from promotion where the scores of the

eliminated candidates are so low as to make promotion of those candidates impossible. There was no such use here, as the cutoff scores, both 70 and 66, were adopted arbitrarily, the former at the insistence of the union, the latter to achieve an acceptably low adverse impact on minority applicants.

The Court finds the City's judgment in this matter questionable but finds nothing to indicate that the judgment of the City was animated by racial animus or intent to discriminate. Accordingly, the Court finds for the Defendant on Plaintiffs' claims of intentional discrimination under the THRA, § 1981, § 1983, and Title VII for both the 2000 and 2002 processes.

## III. Remedy

Having come to the difficult determination that the City of Memphis violated Title VII with regard to both the 2000 and 2002 processes, the Court is left with the even more difficult question of proper remedy.

### a. Civil Service Laws

Under Tennessee law, when a plaintiff asserts an injury that involves an alleged statutory violation, it is incumbent upon the court to determine whether the statute in question provides the plaintiff with a cause of action. Petty v. Daimler/Chrysler Corp., 91 S.W.3d 765, 768 (Tenn. Ct. App. 2002). In other words, the mere fact that a statute has been allegedly violated and some person harmed, does not automatically give rise to a private cause of action for monetary relief in favor of that person. Local 3-689, Oil, Chemical & Atomic Int'l Union v. Martin Marietta Energy Sys., 77 F.3d 131, 136 (6th Cir. 1996). In construing the statutory section at issue, the Court is "not privileged to create [a private right of action] under the guise of liberal interpretation of the statute."

<u>Premium Finance Corp. of Am. v. Crump Ins. Serv. of Memphis, Inc.</u>, 978 S.W.2d 91, 93 (Tenn. 1998). Rather, it is the legislative body that has the authority to create legal rights and interests and no right of action can be brought until there is legislative authority for that right of action. <u>Id.</u>; <u>Hogan v. McDaniel</u>, 319 S.W.2d 221, 225 (Tenn. 1958). As a result, the burden of proving the existence of a private right of action lies with the plaintiff. <u>Premium Finance</u>, 978 S.W.2d at 93 (citing <u>Ergon, Inc. v. Amoco Oil Co.</u>, 966 F. Supp. 577, 585 (W.D. Tenn. 1997)).

Relying on <u>Ergon</u>, this Court noted recently that Tennessee courts have utilized the standard set forth by the United States Supreme Court to determine whether a statute implies a private right of action. <u>Matthews v. Storgion</u>, 335 F. Supp. 2d 878, 890 (W.D. Tenn. 2004). In that case, the Court observed that "[t]he touchstone of the analysis is legislative intent: whether the legislature intended in passing the statute to provide a private right of action." <u>Id.</u> (quoting <u>Ergon</u>, 966 F. Supp. at 583). The factors to consider include whether "1) the plaintiff is a member of the class intended to benefit from the statute, 2) there is any indication of a legislative intent to create a private right of action under the statute, and 3) a private cause of action is consistent with the underlying purposes of the legislation." <u>Id</u>.

Under the above test, the court must first look to the language of the statutory section for guidance. <u>Id</u>. (citing <u>Ergon</u>, 966 F. Supp. at 584). As stated by the Court in <u>Ergon</u>, "unless the legislative intent to create a private right of action 'can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" <u>Ergon</u>, 966 F. Supp. at 584 (quoting <u>Thompson v. Thompson</u>, 484 U.S. 174, 179, (1988)).

In the present case, neither the Charter nor the City Ordinance provisions at issue explicitly provide for a private cause of action for individual monetary relief or retroactive promotions for an alleged violation of these provisions. There is no enforcement mechanism specifically set forth in § 250.1 of the Charter or § 9-3 of the City Ordinances. See Premium Finance, 978 S.W.2d 93 (finding no private right of action, in part, where the statute at issue imposed a specific, mandatory duty but provided no enforcement mechanism for the duty).

Additionally, the respective Articles in which these sections exist do not provide for any method of enforcing the provisions § 250.1 of the Charter or § 9-3 of the City Ordinances. See Charter, Art. 34; Memphis Code of Ordinances, Art. 9. Finally, there is nothing explicit or implicit in either provision that indicates any intent to provide a private right of action for monetary relief or retroactive promotions to enforce these provisions. Cf. Pratt v. Smart Corp., 968 S.W.2d 868, 872-73 (Tenn. Ct. App. 1997) (finding that the Medical Records Act authorized a private cause of action by reason of the fact that it allowed for recovery of "actual damages" for willful or reckless violations). Thus, the language of the Charter and City Ordinance provisions does not support a private right of action for monetary relief or retroactive promotions.

Accordingly, although the Court has found Defendant to be in violation of the City Charter and Ordinances in its administration of the 2000 process, the Court finds that the remedies Plaintiffs seek are unavailable under the city laws.

### b.  Title VII

In formulating a remedy for the City's Title VII violations, the Court is guided by two fundamental principles: 1) The purpose of Title VII is to eradicate discrimination by

facilitating a workplace environment where hiring and promotion are driven entirely by merit[9], and 2) The goal of a remedy in a discrimination suit is to return the victim of discrimination to the state he/she would have been in if the discrimination had not taken place.[10]

In the instant case, the ideal remedy would have been to freeze the promotion of officers and to replace the invalid process with a valid one immediately upon the determination that the process was invalid. This outcome was never fully attainable, given the time and resources required to devise such a test, and this ideal is far more remote now, nearly four years after the completion of the second of the contested promotion processes. In those four years, over 200 officers have been promoted to sergeant, have assumed new jobs, and have altered their and their families' lives in reliance upon those promotions.

Even if it were possible to reverse time, and the Court could disregard the inequity of demoting officers after several years of service for no fault of their own, those demoted would not be at parity with their peers. They would have the benefit of years of experience as sergeants going into the next round of sergeant promotion, giving them a potentially insurmountable advantage.[11] Would the Court then require the scores of these candidates to be "handicapped" so as to eliminate any advantage they might enjoy? This approach is far too thorny to warrant the Court's serious consideration.

---

[9] "[T]he very purpose of title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color." Griggs, 401 U.S. at 434 (quoting 110 Cong.Rec. 7247).

[10] "It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." Albemarle, 422 U.S. at 418.

[11] The advantage must be significant if the notion of job-relatedness in promotion testing has any merit at all. In other words, if a promotion test purports to test those skills necessary to succeed in the position of sergeant, an officer who had been honing those skills in four to six years as a sergeant would presumably now possess them in considerable abundance, even if he or she had little in the way of such skills when first assuming the position.

If it is untenable to restore the parties to the *status quo ante*, is it sufficient to simply insist that the next promotion process be a valid one? First of all, the courts have been so insisting for decades and the law has been so insisting for even longer. More importantly, even if such a declaration could prevent future discrimination, it would do nothing to address the fact that certain applicants have been advantaged and others have been disadvantaged by the invalid processes of 2000 and 2002.

While the Court cannot reverse time, a proper remedy should, to the extent possible, leave those disadvantaged on an even footing with those advantaged. The key challenge with this approach is identifying those who have been injured. By administering an invalid, discriminatory promotion process, the City of Memphis has committed a social wrong and has inflicted a societal injury. This process has promoted more Caucasian and fewer African Americans than would have occurred if the process had been valid and non-discriminatory. However, it is impossible to identify which African American candidates would have been promoted and which Caucasian candidates would not have been. We cannot use the rankings from the invalidated processes for this purpose because these results are invalid. Implementing a valid process would amount to a reshuffling of the deck. There is no way of knowing who would hold the winning hands under such a valid, non-discriminatory process.

If demoting those already promoted under an invalid process and starting over is an untenable remedy, and identification of those individually injured is impossible, then the only remaining remedy is to compensate all plaintiffs such that a certain parity of treatment with those already promoted is achieved. This approach would necessarily involve backpay, seniority credit, and, of course, promotion. This remedial scheme has

the advantage of simplicity. However, it has the unfortunate disadvantage of potentially promoting a number of people whose knowledge and skills do not warrant promotion. This approach essentially awards remedy to all plaintiffs because, while injury occurred, individual injury cannot be assessed. Unfortunately, there is simply no way around this unhappy result. This remedial scheme ensures that no one deserving promotion is denied promotion because of an illegally discriminatory process, and that is the best that can be achieved under the circumstances. Of course, all plaintiffs have a minimum of five years experience[12] and this provides some assurance of minimal competence.

Awarding backpay, promotion and seniority credit leaves one form of injury unaddressed, namely the opportunity for further promotion foregone by the denial of promotion to sergeant. For instance, an officer denied promotion in the 2000 process might have by now been promoted to lieutenant if not for such denial. Plaintiffs argue that because they were not allowed to take the lieutenant's promotion process conducted in January 2005 due to the denial of their promotion to sergeant, the remedy owed them should include being allowed to take a lieutenant's test immediately. They assert that any plaintiff scoring as high as any individual selected for promotion to lieutenant, or within the range of scores that the City intends to promote from, should be promoted to lieutenant retroactive to January 2005 with appropriate backpay.

Plaintiffs request for the immediate opportunity for advancement to lieutenant is not without merit. If the Court's goal is to compensate all plaintiffs such that parity of treatment with those already promoted is achieved, then the idea of allowing the newly promoted sergeants to make up for lost time by taking the lieutenant's test immediately

---

[12] By now, the <u>Johnson I</u> plaintiffs have at least eleven years experience as police officers and the other plaintiffs have at least nine years of experience.

has a certain logical appeal. This strategy has a fatal flaw, however: it allows for promotion to lieutenant of officers who lack the minimum requirements for such promotion. The Court must assume that the requirement of two years experience as a sergeant is more than a mere formality. It would be, in the Court's judgment, irresponsible to override this requirement by requiring the premature advancement of officers to a position of such heightened responsibility. Consequently, the Court denies Plaintiffs this element of their requested relief.

Based on the foregoing analysis, the Court grants minority plaintiffs[13] relief as follows: As remedy for Plaintiffs' injuries under Title VII, the Court orders the City of Memphis to promote all minority plaintiffs who have not already been promoted to the rank of sergeant within 30 days. The Court further orders that the City, within 60 days, pay to those plaintiffs thus promoted backpay commensurate with their having assumed the sergeant rank on the date of their first denial of promotion under either the 2000 or 2002 process.[14] To those Johnson I plaintiffs who were promoted in the 2002 process, the Court grants backpay from the date of their denial of promotion under the 2000 process to the date of their subsequent promotion. Finally, the Court orders the City, within 30 days, to amend the employee records of all minority plaintiffs to reflect seniority credit commensurate with their having assumed the sergeant rank on the date of their first denial of promotion under either the 2000 or 2002 process.

---

[13] Minority plaintiffs are as follows: **2000 process**: Acosta, Brown, Burford, Campbell, Davis, Easter, Echols, Hyman, Jackson, Johnson, Chorcie Jones, Ursula Jones, Lamondue, Lanier, Luellen, Martin, Mitchell, Moore, Murrell, Ross, Tisby, VanBuren, Ware, White and Young. **2002 process**: Able, Badgett, Billingsley, Black, Bivens, Loyce Bonds, Sherman Bonds, Brown, Burford, Carter, Clifton Date, Eric Dates, Carlos Davis, Fair, Gardner, Gray, Hardaway, Hulsey, Arlanda Jackson, Evlin Jackson, Philip Jackson, Johnson, Bobby Jones, Chorcie Jones, Deborah Jones, Ursula Jones, Lamondue, Lanier, Lawrence, Lucas, Martin, McDaniel, McNeil, Mitchell, Moore, Murrell, Neloms, Ray, Ross, Segrest, Smith, Daffney Thomas, Ryan Thomas, Valentine, Van Buren, Watson, White, Jackie Williams, John Williams, and Winston.

[14] Backpay is to be calculated according to the parties' stipulation entered on May 9, 2005 (D.E. # 336).

Plaintiffs shall submit an updated calculation of their backpay within thirty days. Defendant is ordered to furnish Plaintiffs with all information and payroll records necessary to update those calculations within fifteen days.

Plaintiffs are entitled to reasonable attorney fees, costs and expenses. Plaintiffs' counsel shall submit an interim statement within sixty days.

The injunction previously issued by this Court enjoining the MPD from filling fifty-two lieutenant vacancies is hereby terminated.

## IV.  CONCLUSION

The Court recognizes that the City has expended considerable time, effort and financial resources to come up with promotional processes that would withstand legal challenge and be untainted by racial and gender discrimination. However, as the foregoing analysis makes clear, the City's efforts have fallen short of their goal. If the City is ever to achieve a reliable, legally valid promotion system unburdened by endless legal challenge it must redouble its efforts. Obviously, the City must procure testing design services of the highest caliber. Perhaps more importantly, the City must require from any test design that it be based on the most recognized, rigorous science currently available, even if this requires expending more money than would otherwise be necessary. Any test design adopted by the City must also be beyond reproach in terms of cultural bias or other forms of adverse impact on minorities. Perhaps most important of all, the City must be proactive in its promotion process, anticipating its needs for promotions before they become urgent. When something goes awry with a promotion process again, the City must allow itself time to fix the problem instead of papering over it and going forward with a flawed promotion process.

For the reasons stated herein, the Court finds for Defendant with regard to Plaintiffs' claims of intentional discrimination as to both the 2000 and 2002 processes and city law violations as to the 2002 process. The Court finds for minority plaintiffs with regard to their Title VII disparate impact claim regarding the 2002 process.

As remedy for Plaintiffs' injuries under Title VII, the Court orders the City of Memphis to promote all minority plaintiffs who have not already been promoted to the rank of sergeant. The Court further orders that the City pay to minority plaintiffs appropriate backpay dated from the date of their first denial of promotion under either the 2000 or 2002 process. The Court also orders the City to adjust the employee records of all minority plaintiffs to reflect seniority credit commensurate with their having assumed the sergeant rank on the date of their first denial of promotion under either the 2000 or 2002 process. Finally, the Court grants Plaintiffs reasonable attorney fees, costs and expenses. Judgment is entered accordingly.

**IT IS SO ORDERED** this 28th day of December, 2006

s/ Bernice Bouie Donald_____
BERNICE BOUIE DONALD
UNITED STATES DISTRICT COURT JUDGE